1
2
3
4
5
6                    IN THE UNITED STATES DISTRICT COURT

7                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

8
9
10   ILWU-PMA WELFARE PLAN BOARD                    No. C 15-02965 WHA
     OF TRUSTEES and ILWU-PMA
11   WELFARE PLAN,

12                    Plaintiffs,

13         v.

14   CONNECTICUT GENERAL LIFE INS.                  **ORDER GRANTING IN PART**
     COMPANY, GREAT-WEST LIFE &                     **AND DENYING IN PART**
15   ANNUITY INSURANCE COMPANY,                     **MOTIONS TO DISMISS**
     and CAREWISE HEALTH, INC., f/k/a
16   SHPS Health Management Solutions, Inc.,

17                    Defendants.
                                                /
18
19                              **INTRODUCTION**

20         In this action for breaches of various duties relating to the administration of an ERISA

21   employee welfare benefit plan, three defendants each move to dismiss certain claims against

22   them.  For the reasons stated below, defendants' motions are **GRANTED IN PART AND DENIED**

23   **IN PART**.

24                              **STATEMENT**

25         Plaintiff ILWU-PMA Welfare Plan is an "employee welfare benefit plan" and a "multi-

26   employer plan" as defined by the Employee Retirement Income Security Act, created by the

27   International Longshore & Warehouse Union (a labor union) and the Pacific Maritime

28   Association (an employer association).  Plaintiff ILWU-PMA Welfare Plan Board of Trustees is

United States District Court
For the Northern District of California

the "named fiduciary and plan administrator" of the Plan as defined by ERISA (Amd. Compl. ¶¶ 4–5).

The Plan offered and self-funded an indemnity program for medical, surgical, and hospital benefits. Through the indemnity program, members could obtain healthcare from providers that agreed to accept pre-negotiated fees as payment in full (in-network), as well as other providers that did not so agree (out-of-network). The indemnity program covered one hundred percent of pre-negotiated fees for covered services provided by in-network providers, but limited reimbursement for services provided by out-of-network providers to a percentage of the "usual, customary, and reasonable" charge for the service in question. Plan members paid the difference between the Plan's reimbursement and the actual cost of the out-of-network service. The Plan determined which healthcare services it would cover and which it would exclude from coverage (Amd. Compl. ¶¶ 12–15).

This matter concerns plaintiffs' relationship with certain third-party vendors that provided services that assisted plaintiffs in administering the healthcare indemnity program. Specifically, defendant Carewise Health, Inc., negotiated discounts on fees from out-of-network providers, and defendants Great-West Life & Annuity Insurance Company and Connecticut General Life Insurance Company processed members' claims under the indemnity program.

## 1. CAREWISE.

In 1997, the Board entered into a written agreement with CENTRA Cost Management Systems (not a party to this action) to negotiate discounts on covered services provided by out-of-network providers for claims in excess of one thousand dollars. The agreement required CENTRA to negotiate claims on a case-by-case basis and to calculate discounts based on the usual, customary, and reasonable rate for the services, rather than on billed charges. CENTRA received commissions of twenty-three percent of the negotiated savings. Plaintiffs did not attach the text of the agreement with CENTRA to their complaint. The description of the written agreement in the complaint does not indicate whether the Board and CENTRA included a termination date in that agreement (Amd. Compl. ¶ 27).

United States District Court

For the Northern District of California

Carewise (then called SHPS Health Management Solutions, Inc.), acquired CENTRA's fee-negotiation business in 2003 and informed plaintiffs of that acquisition. Although CENTRA and Carewise negotiated fees, they did not make payments. Instead, they referred their negotiated fees to the Plan's third-party administrator (first Great-West, later Connecticut General, as discussed below). Upon Carewise's acquisition of CENTRA's fee-negotiation business, the Board provided Carewise with copies of the documents that governed the Plan, and Carewise continued to negotiate fees on behalf of the Plan (*id.* ¶¶ 27–29).

In 2005, Carewise proposed a draft written agreement to a consultant for the Plan in order to memorialize the terms of the work it performed following its acquisition of CENTRA's fee-negotiation business. It provided that the negotiations would continue to occur on a case-by-case basis with compensation at twenty-three percent of negotiated savings. It further provided for Carewise to conduct post-payment audits of bills from healthcare providers for further compensation at a percentage of the amounts audited. The parties never executed that agreement, nor was it ever reviewed by the Board (*id.* ¶ 29).

In 2009, Carewise, without authorization from plaintiffs, entered into several "auto-discount" agreements with healthcare providers, in which it guaranteed providers that they would receive fast payment of fees without any auditing if the providers agreed to certain fixed discounts based on the actual billed charge, rather than based on the usual, customary, and reasonable rate for the service (as required by the Plan). Because these auto-discounts were based on billed charges, Carewise ultimately negotiated fees to be paid at rates above the usual, customary, and reasonable rates. Nevertheless, Carewise continued to receive a twenty-three percent commission on the amount of the discounts realized through negotiations, paid by the Plan (*id.* ¶¶ 21, 71–73).

Plaintiffs discovered these auto-discount agreements in 2010 and repudiated them. Carewise resigned as a vendor to the Plan in April 2012 (*id.* ¶¶ 30, 75).

**2.      GREAT-WEST AND CONNECTICUT GENERAL.**

In 1999, plaintiffs entered into a written contract with defendant Great-West Life & Annuity Insurance Company, which provided that Great-West would act as a third-party

administrator of the various aspects of plaintiffs' ERISA plan, including the healthcare indemnity program.  Great-West established an office in San Francisco dedicated exclusively to administering plaintiffs' various benefits.

Great-West's responsibilities under its contract with plaintiffs included adjudicating plan-members' claims as part of the health-care indemnity program, maintaining records regarding individual benefits, evaluating health care utilization for fraud and abuse, and preparing and issuing checks to pay claims with Plan assets.  Great-West's contract with the Plan explicitly provided that it would not serve as a Plan fiduciary (*id.* ¶ 21).

Section 9.3 of the Plan's contract with Great-West required it to "hold all papers, books, files, correspondence and records of all kinds which at any time shall come into its possession . . . relating to the transactions performed . . . for the [Board] under this Contract and shall, to the extent permitted by law, surrender them to the [Board] upon prior request" (*id.* ¶ 23).

In 2004, plaintiffs retained an accounting firm to perform a claims audit.  The audit reviewed a sample of claims and determined that Great-West had paid nearly one million dollars in out-of-network claims in full as-billed, rather than as a percentage of the usual, customary, and reasonable charge standard in that sample set of claims alone.  This occurred without independent review and without any negotiation (*id.* ¶ 35).

In 2007, the Board entered into a stipulation with Great-West, confirming its obligation to apply the usual, customary, and reasonable charge standard to all non-facility out-of-network procedures, and to provide monthly reports about those charges.  Further, that stipulation required Great-West to refer all claims over one thousand dollars to Carewise for fee negotiation and settlement of claims (*id.* ¶¶ 35–37).

In 2008, Connecticut General acquired Great-West's healthcare administration unit, including its obligations to plaintiffs.  Connecticut General represented to the Board that its Special Investigations Unit was "an industry leader in fraud detection and fraud savings returning a current average of savings-to-costs well in excess of the industry standard through its pre-payment investigation process" (*id.* ¶¶ 24–25).

**United States District Court**
For the Northern District of California

In late 2009, plaintiffs retained the same accounting firm to conduct a repeat audit. That audit revealed that Great-West failed to apply the usual, customary, and reasonable charge standard to claims it referred to Carewise for negotiations and that Connecticut General, failed to apply the usual, customary, and reasonable charge standard entirely. Further, both Great-West and Connecticut General made clerical errors that resulted in duplicative charges and procedures being performed too frequently, and they failed to review claims for exclusions such as medical necessity resulting in an overall error rate of 10.1% (twice the industry standard). Connecticut General also calculated reimbursement amounts without accounting for patient copayments, entered into an agreement with Carewise regarding its auto-discounts on fees for out-of-network providers, and failed to discover numerous instances of fraud (*id.* ¶¶ 33–63).

In 2010, Connecticut General began implementing the usual, customary, and reasonable rate standard, but certain healthcare providers objected and sued our plaintiffs for fees above that rate (*id.* ¶ 53).

The Board terminated its contractual relationship with Connecticut General in 2012. Upon termination, the Board requested copies of all of Connecticut General's records for the plan. Connecticut General conditioned delivery of the records on a $300,000 payment, which plaintiffs paid in protest. Connecticut General kept those records in a proprietary database, so they could not easily be searched. It also maintained some records in hard copy, causing plaintiffs to incur considerable expense in scanning and indexing those records as they worked to get their new third-party administrator running (*id.* ¶ 64–69).

Plaintiffs commenced this action in June 2015 and amended the complaint in September. The amended complaint alleges various claims for breach of fiduciary duties under ERISA, a claim based on a prohibited transaction of a non-fiduciary under ERISA, breach of contract, negligence, unjust enrichment, indemnity, and violation of the California Unfair Competition Law. Defendants each separately move to dismiss certain claims against them. This order follows full briefing and oral argument.

**ANALYSIS**

**1.     ERISA CLAIMS.**

Plaintiffs bring six claims under ERISA for various breaches of fiduciary duties and for non-fiduciary prohibited transactions.  Plaintiffs acknowledge that their written contracts with Great-West and Connecticut General explicitly stated they would not serve as fiduciaries.  They also acknowledge they had no written contract with Carewise.  Instead, plaintiffs allege that defendants became *de facto* EIRSA fiduciaries through their conduct.  Carewise also contends it did not act as a "party in interest" that could be found liable as a non-fiduciary for prohibited transactions.  An issue regarding standing must be addressed first.

**A.     Standing.**

Defendants contend that the Plan lacks standing to sue under ERISA.  Our court of appeals held that an ERISA plan lacks standing under ERISA in *Local 159 v. Nor-Cal Plumbing, Inc.*, 185 F.3d 978, 983 (9th Cir. 1999).  The only decisions from our circuit that plaintiffs cite for the position that the Plan has standing to sue on the ERISA claims herein are not on point.  In *Cyr v. Reliance Standard Life Insurance Co.*, 642 F.3d 1202, 1206 (9th Cir. 2011), our court of appeals held that a plan could be a *defendant* in an action for a breach of ERISA fiduciary duties but made no mention of a plan's standing to assert a claim based on a fiduciary duty.  *ABC National v. Aubry*, 68 F.3d 342 (9th Cir. 1995), simply did not involve ERISA claims, but rather claims under Section 1983.

Plaintiffs also contend that Section 1132(d)(1) of Title 29 of the United States Code, which provides that "an employee benefit plan may sue or be sued under this subchapter as an entity," confers standing on the Plan.  Not so.  Our court of appeals rejected that argument in *Local 159*, 185 F.3d at 983 n.4, holding that Section 1132(d)(1) merely ensures that a plan is "treated as [an] entit[y] capable of suing and being sued" but does not confer standing.  Accordingly, the Plan lacks standing as to claims one through six.

The Board has standing to sue under ERISA.  Its claims thereunder are now discussed.

United States District Court

For the Northern District of California

**B.**     **ERISA Fiduciary Claims.**

Section 1002(21)(A) of Title 29 defines a fiduciary under ERISA.  It provides, in pertinent part:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

In *IT Corp. v. General American Life Insurance Co.*, 107 F.3d 1415, 1421 (9th Cir. 1997), our court of appeals recognized:

> The statute treats control over the cash differently from control over administration.  The statutory qualification, that control must be "discretionary" for it to establish fiduciary status, applies to the first and third phrases, management and administration but not to the second, assets.  "Any" control over disposition of plan money makes the person who has the control a fiduciary.

The Board contends that each of the defendants is an ERISA fiduciary as contemplated by *IT Corp.*

The plaintiff in *IT Corp.* alleged that the defendant, a third-party administrator of the plaintiff's ERISA plan, paid over six hundred thousand dollars on a non-covered claim.  There, our court of appeals reversed a district court's order granting the defendant's Rule 12 motion on the basis that the alleged overpayment could not support the plaintiffs' contention that the defendant became an ERISA fiduciary.  In evaluating whether the defendant exercised discretionary authority, *IT Corp.* considered two prior decisions from our court of appeals regarding ERISA fiduciary status.

In *Yeseta v. Baima*, 837 F.2d 380 (9th Cir. 1988), after a bench trial, the district court held that the person who managed one of the benefits offered by his company's ERISA plan became a *de facto* fiduciary when he transferred plan funds to his company's general operating account at the direction of the principal of the company.  Our court of appeals affirmed that conclusion because whether or not the benefits manager had authority to make the withdrawal, he "exercised control over and disposed of" plan assets, and "[h]is acts in this respect were not ministerial."  *Id.* at 386.

United States District Court

For the Northern District of California

On the other hand, in *Kyle Railways, Inc. v. Pacific Administration Services, Inc.*, 990 F.2d 513, 515 (9th Cir. 1993), a third-party administrator of an ERISA plan did not become a *de facto* fiduciary by paying some non-covered claims, double-paying claims, and paying claims late. The allegations in *Kyle* could not survive a Rule 12 motion because the defendant's errors occurred in the performance of "ministerial duties or process[ing of] claims," which conduct could not establish a fiduciary relationship. *Id.* at 516. That conclusion rested in part on guidance issued by the Department of Labor regarding certain administrative functions that identified several "purely ministerial functions" the performance of which could not make an entity an ERISA fiduciary. 29 C.F.R. 2509.75-8 (Question D-2). That list of functions included "application of rules determining eligibility for participation of benefits," "calculation of benefits," "processing of claims," and "making recommendations to others for decisions with respect to plan administration."

*IT Corp.*, 107 F.3d at 1421, distinguished *Kyle* inasmuch as the latter involved "[t]he power to err, as when a clerical employee types an erroneous code onto a computer screen, not the kind of discretionary authority which turns an administrator into a fiduciary." By contrast, the claims in *IT Corp.* did not rely on mere allegations of clerical errors, but on a wholly mistaken exercise of discretion in the implementation of the plan:

> For all we know from the record as it stands, [the defendant] paid $600,000 on a non-covered medical claim, not through clerical error, but because it had considerable discretion and made a misjudgment about plan interpretation. That would be more like *Yeseta*.

Moreover, *IT Corp.* held, the plaintiff adequately alleged that the defendant became a *de facto* fiduciary simply because it had "[t]he right to write checks on plan funds" and thus exercised "authority or control respecting management or disposition of its assets" within the definition of an ERISA fiduciary in Section 1002(21)(A)(i).[1] Accordingly, because the plaintiff in *IT Corp.* alleged both that the defendant's error arose from an exercise of discretion over plan

---

[1] *IT Corp.* held that the allegation of the right to write checks was sufficient to withstand a motion to dismiss claims based on the defendant's fiduciary status. It expressly declined, given the early stage of the case, to hold that such right would make the defendant a fiduciary as a matter of law.

1    management and because the defendant had the right to write checks, the plaintiff had

2    adequately alleged that the defendant became a *de facto* ERISA fiduciary.

3         So too here.  The alleged breaches in our case do not arise out of the performance of

4    merely ministerial tasks.  Although defendants each attempt to categorize their responsibilities

5    as merely ministerial application of the Plan's formula for reimbursement, the complaint

6    adequately alleges that our defendants exercised considerable discretion by setting aside the

7    usual, customary, and reasonable rate for such reimbursement and applying their own schemes.

8    Even if the Board never actually gave defendants that discretion, the allegations offer sufficient

9    support for the inference that defendants usurped authority over plan management from our

10   plaintiffs, and exercised discretion as a matter of fact.  Indeed, Great-West continued to pay the

11   claims that it referred to Carewise without regard to the usual, customary, and reasonable rate

12   standard and Connecticut General paid all claims without regard to that standard.  Similarly,

13   Carewise automatically guaranteed quick and audit-free payment to providers based on

14   discounts from billed rates, causing Connecticut General, in turn, to pay rates negotiated in

15   derogation of the terms of the plan.

16        As in *IT Corp.*, 107 F.3d at 1415, "[i]t may turn out, when the record is more fully

17   developed, that [the defendant] had no discretion," but instead made improper payments and

18   breached other duties purely out of negligent performance of ministerial tasks.  At this stage in

19   the case, however, it would be premature to hold as a matter of law that defendants had no

20   discretion sufficient to qualify them as fiduciaries, given the allegations that defendants acted

21   *ultra vires* and applied their own frameworks for administering the Plan (rather than merely

22   erring in adhering to the framework in place).  Moreover, it is undisputed that Great-West and

23   Connecticut General had the authority to write checks on the Plan's assets and to issue those

24   checks to the Plan's members and thereby exercised "authority or control respecting

25   management or disposition of [Plan] assets."  These allegations, as *IT Corp.* held, are sufficient

26   to survive a motion to dismiss.

27        Defendants cite numerous decisions that held third-party administrators did not become

28   fiduciaries because they never had final decision-making authority regarding plan management.

*See, e.g.*, *Aetna Life Ins. Co. v. Bayona*, 223 F.3d 1030 (9th Cir. 2000); *Klosterman v. Western Gen. Management*, 32 F.3d 1119, 1124 (7th Cir. 1994); *Gelardi v. Pertec Computer Corp.*, 761 F.2d 1323, 1325 (9th Cir. 1985) (overruled on other grounds); *Edel v. Schering-Plough Group Benefits Plan*, No. 11-2778, 2011 WL 5871099 (N.D. Cal. Nov. 22, 2011) (Judge Thelton E. Henderson); *Samuels v. PCM Liquidating, Inc.*, 898 F. Supp. 711 (C.D. Cal. 1995) (Judge Ronald Lew); *Mertens v. Kaiser Steel Retirement Plan*, 829 F. Supp. 1158, 1161 (N.D. Cal. 1992) (Judge Marilyn Hall Patel).

None of defendants' citations involved facts such as those alleged herein, namely, that the third-party administrators acted *ultra vires* and decided to process claims and negotiate fees according to their own preferred framework without regard to the limitations of the plan. Rather, each decision cited involved ERISA fiduciary claims based solely on the performance of ministerial duties within a framework established by a plan. Defendants never address the allegations that they became *de facto* fiduciaries by usurping discretionary authority head on. Instead, they rest on the terms of their respective agreements with plaintiffs that explicitly precluded them from exercising fiduciary responsibilities (or in Carewise's case, the lack of a written agreement at all). "[A] contract exonerating an ERISA fiduciary from fiduciary responsibilities is void as a matter of law." *IT Corp.*, 107 F.3d at 1418.

Thus, defendants have failed to overcome the Board's allegations that they became *de facto* fiduciaries by exercising discretionary authority over plan administration or that Great-West and Connecticut General also became *de facto* fiduciaries because they held and exercised the right to write checks to dispose of plan assets. Accordingly, defendants' motions to dismiss claims one through three are **DENIED**.

To the extent plaintiffs' ERISA fiduciary claims survive, defendants further argue that ERISA preempts any state-law claims. Before reaching that issue, this order turns to defendants' fourth through sixth claims, against Carewise for conducting transactions prohibited by ERISA.

### C.    Prohibited Transactions.

The Board's fourth through sixth claims allege that Carewise engaged in prohibited transactions under ERISA.  Specifically, claims four and five allege that Carewise engaged in self-dealing as a plan fiduciary by entering into auto-discount agreements with providers for which it received a portion of the amount discounted.  Claim six alleges that Carewise received unreasonable compensation as a "party in interest" (which does not rely on Carewise's status as a fiduciary).

Carewise reasserts its contention that it never became a *de facto* fiduciary, so it cannot be liable for self-dealing as a fiduciary.  As discussed above, the Board has adequately alleged that Carewise assumed fiduciary duties, accordingly, claims four and five survive.

The Board's sixth claim alleges that Carewise engaged in a prohibited transaction in violation of Section 1106(a)(1)(C) of Title 29 of the United States Code.  Section 1106(a)(1)(C) generally prohibits transactions between an ERISA plan and a "party in interest," although Section 1108 allows such transactions for "services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid" for services rendered by the party in interest.  Section 1002(14)(B) defines a "party in interest" as "a person providing services to [a] plan."

Carewise argues that it did not meet the definition of a party in interest, that it never caused the Plan to engage in any transaction, and that any compensation it received was reasonable.  Each of Carewise's arguments fails.  *First*, although no written agreement existed between the Board and Carewise, the Board has adequately alleged facts to show that Carewise negotiated fees with providers subject to an implied contract patterned on the terms of the Board's agreement with CENTRA.[2]  It is true that Carewise submitted its negotiated rates to Great-West and Connecticut General for final approval, but that does not preclude the inference

----

[2] Carewise asserts that plaintiffs "previously disclaimed having any contractual privity with Carewise" (Carewise Mtn. at 4).  They cite to Exhibit 4 attached to their motion, however, no exhibits are attached. Exhibit 4 is described as "Plaintiffs' judicial admissions" in a related case, *ILWU-PMA Welfare Plan v. South Gate Ambulatory Surgery Center*, No. 11-1215 (N.D. Cal.).  In that case, plaintiffs disclaimed contractual privity with *providers* that had entered into auto-discount agreements with Carewise (then called SHPS), and plaintiffs noted that it never authorized Carewise to enter into such agreements.  Plaintiffs made no such disclaimer regarding Carewise itself (*ILWU-PMA v. South Gate*, Dkt. Nos. 43 at 4, 145 at 6, 147 ¶ 13).

that Carewise provided its negotiation services to the Board pursuant to an implied contract and thereby acted as a "party in interest." *Second*, the complaint is vague as to how Carewise received compensation for its negotiation services. The complaint alleges that Carewise "was paid a commission of 23% on all 'savings' achieved by fee negotiations" (Amd. Compl. ¶ 73). At this stage, the Board has adequately alleged that Carewise and the Board transacted for fee-negotiation services. *Third*, the Board alleges that Carewise received commissions based on the discounts realized through their auto-discounts from billed rates rather than usual, customary, and reasonable rates, that Carewise did not audit those discounts, and that plaintiffs ultimately paid charges in excess of the usual, customary, and reasonable rates (Amd. Compl. ¶¶ 105–09). Moreover, by implementing auto-discounts, rather than negotiating claims on a case-by-case basis, Carewise received compensation for fee-negotiation services it never actually performed. Plaintiffs have adequately alleged that Carewise received unreasonable compensation for negotiation services it did not perform.

Accordingly, Carewise's motion to dismiss the plaintiffs' sixth claim is hereby **DENIED**. This in no way implies that the Board and its staff and lawyers acted reasonably and with due care, an issue not yet ripe for determination.

### 2. STATE-LAW CLAIMS.

Plaintiffs bring five categories of claims under state law. Each is addressed in turn. An issue relating to preemption must first be addressed.

#### A. ERISA Preemption.

To the extent plaintiffs' ERISA claims against them survive, defendants argue that any state-law claims against them are preempted. Section 1144(a) of Title 29 of the United States Code preempts state-law claims that "relate to" an ERISA plan. The parties agree that a state-law claim relates to ERISA and is therefore preempted if it "encroaches on the relationships regulated by ERISA." *General American Life Ins. Co. v. Castonaguay*, 984 F.2d 1518, 1522 (9th Cir. 1993). On the other hand, "where a plan operates just like any other commercial entity — for instance the relationship between the plan and its own employees," preemption does not apply. *Ibid.* In *Geweke Ford v. St. Joseph's Omni Preferred Care, Inc.*, 130 F.3d 1355, 1360

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

(9th Cir. 1997), our court of appeals held that ERISA did not preempt a breach-of-contract claim against a third-party administrator when the claim "[did] not mandate employee benefit structures or their administration; [did] not bind employers or plan administrators to particular choices or preclude uniform administrative practice; and [did] not provide alternate enforcement mechanisms for employees to obtain ERISA plan benefits."

Insofar as defendants' acted as *de facto* fiduciaries, plainly their performance of their fiduciary duties is "governed by ERISA" and any state-law claims based on their conduct would be preempted.  However, the complaint also alleges that defendants breached certain contractual duties, such as the proper maintenance of records and that they made clerical errors, which did not relate to their *de facto* fiduciary relationships to the Plan, but rather to their contractual obligations to perform certain ministerial duties, which claims are not preempted.  Moreover, to the extent plaintiffs' state-law claims would be preempted if our defendants are ultimately shown to have acted as *de facto* fiduciaries, plaintiffs may pursue both theories simultaneously at this stage, as now discussed.

Rule 8(e)(2) provides (emphasis added):

> A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as the party has *regardless of consistency* and whether based on legal, equitable, or maritime grounds.

That is, plaintiffs may pursue their state-law claims for the time being *even to the extent they may ultimately be preempted*.  Thus, this order need not (and should not as a matter of prudence) address whether ERISA preempts plaintiffs' state-law claims — that decision is best reserved for a more fully-developed record.

Indeed, the decision in *Coleman v. Standard Life Ins. Co.*, 288 F. Supp. 2d 1116 (E.D. Cal. 2003) (Judge Lawrence K. Karlton), reached the same conclusion.  There, the parties disputed whether ERISA governed the employee benefit plan at issue.  Judge Karlton held:

> In the ERISA context, in particular, there will often be good reason for alternatively pleading state and federal claims.  When there is

13

United States District Court
For the Northern District of California

> some doubt over whether ERISA is applicable under a given set of facts, especially where there is doubt about whether a particular plan is in fact an ERISA plan, proceeding in any other way can be hazardous for the plaintiff. If the plaintiff brings only state law claims and the court determines there is an ERISA plan, the state law claims are preempted. But if the plaintiff brings only an ERISA claim and the plan turns out not to be an ERISA plan, the plaintiff is also out of luck. Thus, ERISA preemption often presents the sort of situation for which Rule 8's alternative pleading provision is designed.

*Id.* at 1120. *Coleman* expressly rejected the reasoning in *Cox v. Eichler*, 765 F. Supp. 601 (N.D. Cal. 1990) (Judge Marilyn Hall Patel), which our defendants cite because *Cox* offered only a bare conclusion that plaintiffs could not be permitted to have "two bites at the apple," inasmuch as it would permit them to effectively circumvent ERISA preemption. Where there remained a dispute as to whether ERISA applied at all, however, *Coleman* held plaintiffs should not be forced to hazard a guess as to the proper basis for their claims at the motion to dismiss stage.

So too here. It is premature to require plaintiffs to commit to a theory of liability at this early stage, without the benefit of discovery. It would be better to resolve the preemption question with a fully developed evidentiary record. Accordingly, to the extent they overlap, plaintiffs may pursue their state-law claims as alternatives to their ERISA claims, pursuant to Rule 8(e)(2). This order now turns to the substance of each of plaintiffs' state-law claims.

**B.      Breach of Contract Claims.**

Plaintiffs' seventh, eighth, and ninth claims are for breach of contract against each defendant, respectively. Connecticut General contends that plaintiffs have not pled a breach of contract with sufficient specificity. Carewise contends that it never entered into a contract with plaintiffs. Great-West does not contest the substance of the breach-of-contract claim against it.

*(i)      Connecticut General.*

Connecticut General asserts that the breach of contract against it fails because plaintiffs have failed to attach a copy of the contract at issue or to set forth its specific terms and because they do not allege performance of their own obligations under the contract.

To plead a *prima facie* case for breach of contract, plaintiffs must plead (1) that a contract between the parties existed, (2) that plaintiffs performed under the contract or that their

14

United States District Court

For the Northern District of California

1    nonperformance was excused, (3) breach by Connecticut General, and (4) damages. *First*

2    *Commercial Mortgage Co. v. Reece*, 89 Cal. App. 4th 731, 745 (2001). The facts supporting

3    the claim must be pled with specificity. *Levy v. State Farm Mut. Auto Ins. Co.*, 150 Cal. App.

4    4th 1, 5 (2007).

5          Both sides agree that plaintiffs failed to reference the provisions or terms in the contract

6    that Connecticut General allegedly breached. Plaintiffs contend, however, that they had no

7    requirement to refer to specific provisions or terms, and that Connecticut General had fair notice

8    of the claims because it had its own copy of the contract. Connecticut General responds that

9    even with a copy of the agreement, it cannot easily identify which provisions it allegedly

10   violated, because, for example, plaintiffs allege that Connecticut General failed "to competently

11   adjudicate claims" although the contract merely obligates it to provide "claims control

12   practices." This leaves Connecticut General (and the Court) to guess at how the claims control

13   activities it implemented violated the contract. Whether or not plaintiffs' lack of specificity as

14   to contract provisions is fatal, their claim against Connecticut General fails for another reason.

15         Both sides also agree that plaintiffs failed to allege that they performed their own

16   obligations under the contract or that they were otherwise excused from such performance.

17   Plaintiffs contend that this failure is of no moment because Connecticut General does not

18   dispute plaintiffs' performance. On the contrary, Connecticut General raised doubts that

19   plaintiffs could plead facts showing that they satisfied their own contractual obligations in good

20   faith, given that plaintiffs apparently failed to exercise their final authority over the

21   administration of the plan while our defendants allegedly applied their own standards to the

22   claims process.

23         Thus, plaintiffs have failed to allege an element of their *prima facie* breach-of-contract

24   claim against Connecticut General, and so that claim must be **DISMISSED**. Plaintiffs may seek

25   leave to cure the deficiencies with an amendment. If plaintiffs seek leave to amend, they should

26   not only plead facts that plausibly show they performed their obligations or that their

27   performance was excused, but they should also endeavor to identify the specific terms of the

28   contract with Connecticut General in issue in this case.

United States District Court

For the Northern District of California

1

### (ii)   *Carewise.*

2      Plaintiffs admit that they never entered into a written agreement with Carewise (Amd.

3   Compl. ¶ 29).  They allege that Carewise's implementation of the auto-discount agreements

4   breached an implied contract between the parties.  California law recognizes that the existence

5   and terms of a contract may be inferred from the parties' conduct.  *Retired Employees Assoc. of*

6   *Orange Cty., Inc. v. Count of Orange*, 52 Cal. 4th 1171, 1178–79 (2011).  Plaintiffs allege that

7   an implied contract between themselves and Carewise because:  (1) Carewise informed

8   plaintiffs it had acquired CENTRA's fee-negotiation business, (2) Carewise attempted to

9   memorialize the terms of their ongoing fee-negotiation work in writing (although plaintiffs

10   rejected that proposal), (3) plaintiffs provided Carewise with the plan documents, (4) Carewise

11   negotiated fee discounts and entered into auto-discount agreements on behalf of plaintiffs, and

12   (5) Carewise received commissions from its services relating to these negotiations (Amd.

13   Compl. ¶¶ 28, 29, 71–75).  Carewise responds that it formed an agreement with *Connecticut*

14   *General* to negotiate out-of-network claims that exceeded one thousand dollars, so plaintiffs

15   dispute is with Connecticut General, not with Carewise.

16      Based on plaintiffs' allegations however, one could infer that the parties entered into an

17   implied contract for the continued provision of fee-negotiation services patterned on the terms

18   of the agreement between plaintiffs and CENTRA, which agreement Carewise inherited and

19   thereafter allegedly breached by entering into auto-discount agreements based on a flat discount

20   against billed charges rather than against the usual, customary, and reasonable charge for

21   services negotiated on a case-by-case basis, *inter alia*.  At the pleading stage, plaintiffs have

22   adequately alleged a claim for breach of an implied contract.  Thus Carewise's motion to

23   dismiss plaintiffs' claim for breach of contract is hereby **DENIED**.

24      Carewise has also moved for a more definite statement pursuant to Rule 12(e), because

25   plaintiffs did not attach any of the alleged auto-discount agreements that give rise to the claims

26   against Carewise.  Rule 12(e) allows a party to move fore a more definite statement if a

27   complaint is "so vague or ambiguous that the party cannot reasonably prepare a response."

28   Given the limited pleading requirements under Rule 8(a), district courts in our circuit note that

United States District Court

For the Northern District of California

1  "[m]otions for a more definite statement are viewed with disfavor, and are rarely granted."

2  *Cellars v. Pac. Coast Packaging, Inc.*, 189 F.R.D. 575, 578 (N.D. Cal. 1999) (Judge Charles R.

3  Breyer).  "Generally, the Court will require a more definite statement only when the pleading is

4  so vague or ambiguous that the opposing party cannot respond, even with a simple denial, in

5  good faith or without prejudice to himself."  *Ibid.*

6        Here, Carewise notes that some of the auto-discount claims that form the basis for

7  plaintiffs' claims may have been addressed in prior litigation between the parties, and it seeks a

8  more definite statement of which auto-discount are at issue.  Carewise has made no showing

9  that it has been so unable to respond to plaintiffs' claims as to warrant a more definite

10  statement.  On the contrary, Carewise has filed an extensive motion to dismiss that thoroughly

11  addresses the viability of claims based on the alleged auto-discount agreements.  To the extent

12  Carewise has defenses specific to certain agreements, those defenses are best resolved on a

13  fully-developed record.  Accordingly, Carewise's motion for a more definite statement is

14  hereby **DENIED**.

15        **C.    Indemnity Claim.**

16        Plaintiffs' fourteenth claim is for indemnity against Connecticut General and Great-

17  West.  Plaintiffs specifically contend that they are each obligated to reimburse plaintiffs for

18  various costs they incurred prosecuting claims on behalf of the Plan as well as "any future

19  settlement or judgment incurred and to be incurred in this action" (Amd. Compl. ¶ 148).[3]

20        Great-West and Connecticut General each agreed as follows (*id.* ¶ 143):

21              [T]o indemnify, protect and hold the Client harmless from any and
              all extra-contractual (non-benefit) costs, loss, liability, claim,
22              damage, or expense (including attorneys' fees, court costs and
              expenses of litigation) arising out of gross negligence, dishonest,
23              fraudulent or criminal acts of [Connecticut General's and Great-
              West's respective] employees and Affiliates acting alone or in
24              collusion with others.

25  Great-West and Connecticut General both argue that plaintiffs failed to allege any facts

26  sufficient to trigger this indemnity provision.  Not so.

27  

28        [3]  Plaintiffs admit that any claim for "future settlement or judgment," inasmuch as any such claim is not
yet ripe (Pls.' Opp. at 36 n.21).

1    Under California law, gross negligence is either "a want of even scant care or an

2    extreme departure from the ordinary standard of conduct." *City of Santa Barbara v. Superior*

3    *Ct.*, 41 Cal. 4th 747, 754 (2007).  Plaintiffs allege that Great-West and Connecticut both

4    engaged in gross negligence by approving claims for services without regard to exclusions in

5    the plan, such as medical necessity.  For example, the sample of claims that plaintiffs' audited

6    in 2009 revealed that more than 85% of epidural steroid injections that Connecticut General

7    paid were not medically necessary.   Plaintiffs allege that they have incurred substantial costs

8    and expenses prosecuting the claims herein as well as against providers that Great-West and

9    Connecticut General allegedly improperly paid as a result of their complete disregard for

10   exclusions of coverage in the Plan.  This order holds that plaintiffs have adequately alleged that

11   Great-West and Connecticut General made extreme departures from the ordinary standards of

12   claims processing by completely disregarding plan exclusions, such as procedures that were not

13   medically necessary, and that plaintiffs incurred significant litigation costs as a result.

14   Great-West and Connecticut General argue that plaintiffs may not recover for costs

15   incurred in affirmatively prosecuting actions against third parties to recover excessive fees paid

16   as a result of their conduct.  The indemnity provision provides no such limitation but rather

17   covers such items as attorney's fees and court costs that arise out of Great-West's or

18   Connecticut General's grossly negligent or dishonest conduct.  At least at the pleading stage,

19   plaintiffs have alleged facts sufficient to support the interpretation that the prosecution of claims

20   for recovery of Plan funds improperly paid as a result of Great-West's or Connecticut Generals'

21   conduct implicate their duty to indemnify our plaintiffs.  Accordingly, defendants' motions to

22   dismiss plaintiffs' indemnity claims are **DENIED**.

23                **D.    Negligence Claims.**

24   Plaintiffs' tenth, eleventh, and twelfth claims are for breach of contract against each

25   defendant, respectively.  Defendants all contend that plaintiffs' negligence claims fail because

26   plaintiffs seek recovery in tort for economic losses allegedly caused by the breach of contract.

27   Plaintiffs respond that their negligence claims seek recovery for the breach of an independent

28   standard of care that inherently applied to the services provided in the contracts at issue.

Under California law, a person "may recover in tort for physical injury to person or property, but not for purely economic losses that may be recovered in a contract action." *San Francisco Unified School District v. W.R. Grace & Co.*, 37 Cal. App. 4th 1318, 1327 (1995). A contract to perform services may, however, give rise to a duty of care, the breach of which could lead to recovery in tort alongside contract recovery. *North American Chemical Co. v. Superior Court*, 59 Cal. App. 4th 764 (1997). That possibility of dual recovery only arises where there exists a *separate* duty of care beyond that established by contract. *Erlich v. Menezes*, 21 Cal. 4th 543, 551 (1999).

Plaintiffs offer only conclusory allegations that defendants had any duty above and beyond their contractual obligations that could give rise to a negligence claim (Amd. Compl. ¶¶ 127, 131, 135). Such allegations are not entitled to the presumption of truth on a motion to dismiss. It is true that, as discussed above, plaintiffs may pursue a claim for indemnity based on Great-West's and Connecticut General's alleged gross negligence, but those claims arise out of their respective *contractual* duties to indemnify the Plan for expenses caused by their gross negligence. As pled, plaintiffs' negligence claim, on the other hand, is based on a breach of a general duty arising out of the performance of services. Accordingly, plaintiffs' negligence claims are hereby **DISMISSED**. Plaintiffs may seek leave to amend this claim to allege a specific professional duty that our defendants breached beyond their obligations pursuant to their respective contracts.

### E.    Unjust Enrichment Claim.

Plaintiffs thirteenth claim, against all defendants, is for unjust enrichment. Defendants argue that there exists no separate action for unjust enrichment in California. This order agrees. Unjust enrichment is "not a cause of action . . . or even a remedy, but rather a general principle, underlying various legal doctrines and remedies. It is synonymous with restitution." *McBride v. Boughton*, 123 Cal. App. 4th 379, 387 (2004). As such, a claim for unjust enrichment is properly pled as a claim for a contract implied-in-law. It "does not lie when an enforceable, binding agreement exists defining the rights of the parties." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996). California, however, recognizes an

1    exception to the rule that unjust enrichment does not lie when an enforceable contract exists:

2    "Restitution may be awarded in lieu of breach of contract damages when the parties had an

3    express contract, but it was procured by fraud or is unenforceable or ineffective for some

4    reason." *McBride*, 123 Cal. App. 4th at 388.

5         Plaintiffs already bring claims for breach of contract against Great-West Connecticut

6    General (albeit, with deficiencies that must be cured, as discussed above), and for breach of an

7    implied contract against Carewise.  Plaintiffs do not allege the contracts were procured by

8    fraud, unenforceable, or ineffective.  Accordingly, plaintiffs fail to state a claim for unjust

9    enrichment, so their thirteenth claim must be **DISMISSED**.  This claim is dismissed without leave

10   to amend inasmuch as no such claim is available under California law.

### F.    Unfair Competition Law Claims.

12        Plaintiffs' fifteenth and final claim is for violation of each of the fraudulent, unfair, and

13   unlawful prongs of the Unfair Competition Law, Section 17200 of the California Business and

14   Professional Code, against all defendants.  "[W]here a UCL action is based on contracts

15   involving either the public in general or individual consumers who are parties to the contract, a

16   corporate plaintiff may not rely on the UCL for the relief it seeks."  *Linear Technology Corp. v.*

17   *Applied Materials, Inc.*, 152 Cal. App. 4th 115, 135 (2007).

18        Here, plaintiffs' UCL claims arise solely from defendants' performance of their

19   respective contracts, and no individual consumers joined those contracts as parties.  Plaintiffs

20   contend that defendants "ignored fraudulent and unscrupulous medical practices and harmed

21   plan beneficiaries by encouraging medical procedures that were not medically necessary" (Pls.'

22   Opp. at 40 n.23).  That argument, however, is not supported by any factual allegations in the

23   complaint.  The cited allegations only state that defendants paid claims on procedures that were

24   not medically necessary.  The complaint fails to allege any harm to the public.

25        Accordingly, plaintiffs have failed to demonstrate, as required by *Linear Technology*,

26   that the conduct that gives rise to their UCL claims involved the public in general or individual

27   consumers who were parties to the contract.  Plaintiffs' fifteenth claim is hereby **DISMISSED**.

28   Plaintiffs may, however, seek leave to amend this claim.

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**3.    GREAT-WEST'S STATUTE OF LIMITATIONS ARGUMENTS.**

Great-West argues that plaintiffs' claims against it (except for the indemnity claim) are time-barred in full or in part.  Plaintiffs entered into a tolling agreement with Great-West in March 2011.  "[A] complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim."  *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1207 (9th Cir. 1995).

**A.    Limitations Period on ERISA Claims.**

ERISA claims must be brought within three years following "the earliest date on which plaintiff had actual knowledge of the breach or violation."  29 U.S.C. 1113(2).  In *Phillips v. Alaska Hotel & Rest. Employees Pension Fund*, 944 F.2d 509, 521 (9th Cir. 1991), our court of appeals held:

> A continuous series of breaches may allow a plaintiff to argue that a new cause of action accrues with each new breach. But if the breaches are of the same kind and nature and the plaintiff had actual knowledge of one of them more than three years before commencing suit, § 1113(a)(2) bars the action.

*Phillips* reached that conclusion by applying the concept of "continuing violations" from employment discrimination and antitrust cases in which the defendants had opportunities to change the practices that gave rise to claims, but instead elected to maintain the status quo.

Here, the stipulation in 2007 interrupted the continuity of Great-West's alleged violations of its duties.  Our plaintiffs became aware of Great-West's first set of violations following an audit in 2004 and took affirmative steps to correct the problems with a stipulation in 2007.  Plaintiffs had no reason to believe Great-West would continue to improperly pay, negotiate, and process claims thereafter, or so it must be presumed on this motion.  This is not the kind of "continuing violation" contemplated by *Phillips*.  Accordingly, plaintiffs' ERISA claims against Great-West for conduct following the 2007 stipulation survive, inasmuch as plaintiffs did not discover them until 2009, less than three years before they entered into a tolling agreement with Great-West.

1

### B.       Limitations Period on State-Law Claims.

2        The limitations period for a breach of contract claim is four years.  Cal. Civ. Proc. Code

3   § 337(1).  Although this order dismisses plaintiffs' negligence claim, plaintiffs may seek leave

4   to amend, so this order also addresses the two-year limitations period for plaintiffs' the

5   negligence claim.  *See* Cal. Civ. Proc. Code § 339(1).  For tort and contract breaches that may

6   not be immediately discoverable, claims based on those breaches accrue "when the plaintiff

7   discovers or should have discovered all facts essential to his cause of action[.]"  *April*

8   *Enterprises, Inc. v. KTTV*, 147 Cal. App. 3d 805, 826, 832 (1983); *accord William L. Lyon &*

9   *Assocs., Inc. v. Superior Ct. of Placer Cty.*, 204 Cal. App. 4th 1294, 1313 (2013).  To rely on

10  delayed discovery as a basis for tolling the limitations period, plaintiffs "must specifically plead

11  facts to show (1) the time and manner of discovery and (2) the inability to have made earlier

12  discovery despite reasonable diligence."  *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797,

13  807 (2005).

14       Plaintiffs allege that they discovered Great-West's violations during the 2009 audit of

15  Connecticut General's claims (following Connecticut General's acquisition of Great-West's

16  business with our plaintiffs), which occurred within the applicable limitations periods for all

17  relevant state-law claims pursuant to the tolling agreement.  They further allege that they had no

18  reason to believe Great-West would have continued to ignore the usual, customary, and

19  reasonable rates standard following the 2007 stipulation.  Moreover, plaintiffs allege that Great-

20  West maintained its records so poorly that they may not have discovered Great-West's

21  violations despite reasonable diligence (Amd. Compl. ¶¶ 35–39, 52).

22       Accordingly, it is not apparent on the face of the complaint that plaintiffs can prove no

23  set of facts that would establish the timeliness of their claims against Great-West.  This is

24  without prejudice to Great-West reasserting this argument on a more fully-developed record.

25

26

27

28

**United States District Court**
For the Northern District of California

**CONCLUSION**

For the reasons stated above, defendants' motions to dismiss are hereby **GRANTED IN PART AND DENIED IN PART**. Specifically, the Plan lacks standing to sue under ERISA, and California law does not recognize standalone unjust enrichment claims, so those claims are **DISMISSED** without leave to amend. Plaintiffs' breach of contract claim against Connecticut General, and their negligence, and Unfair Competition Law claims are **DISMISSED** with leave to amend. Plaintiffs may seek leave to amend within **FOURTEEN CALENDAR DAYS** of the date of this order. Plaintiffs should plead their best case regarding all of the arguments raised in defendants' respective motions, not just those addressed in this order.

**IT IS SO ORDERED.**

Dated:   December 22, 2015.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE